## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE PMI GROUP, INC., a Delaware Corporation,[1] | ) ) ) | Case No. 11-13730 (___) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DECLARATION OF L. STEPHEN SMITH IN SUPPORT OF
## CHAPTER 11 PETITION AND REQUESTS FOR FIRST DAY RELIEF

I, L. Stephen Smith, being duly sworn, depose and say:

1.    I am the Chairman, Chief Executive Officer, President and Chief Operating Officer of The PMI Group, Inc. (the "**Debtor**" or the "**Company**"), a corporation organized under the laws of the state of Delaware, the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "**Chapter 11 Case**"). I am authorized to submit this declaration (the "**First Day Declaration**") on behalf of the Debtor.

2.    As Chairman, Chief Executive Officer, President and Chief Operating Officer of the Debtor, I am one of the persons responsible for devising and implementing the Debtor's business plan and strategies, overseeing the Debtor's financial and legal affairs and supervising the maintenance of its books and records. As a result of my tenure with the Debtor, my review of public and non-public documents, and my discussions with other members of the Debtor's management team, I am familiar with the Company's business, financial condition, policies and procedures, and books and records. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtor's retained

---

[1]    The last four digits of the Debtor's federal tax identification number are 9675. The Debtor's mailing address is 3003 Oak Road, Walnut Creek, California 94597 (Attn: L. Stephen Smith).

advisors that report to me in the ordinary course of my responsibilities. References to the Bankruptcy Code, the chapter 11 process and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.    Today (the "**Petition Date**"), the Debtor filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware (the "**Court**"). The Debtor will continue to operate its business and manage its property as a debtor-in-possession.

4.    I submit this First Day Declaration on behalf of the Debtor in support of the Debtor's (a) voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**") and (b) "first-day" motions, (collectively, the "**First Day Motions**").[2] The Debtor seeks the relief set forth in the First Day Motions with the goal of minimizing the adverse effects of the commencement of the Chapter 11 Case on its business. I have reviewed the Debtor's petition and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the success of the Debtor's Chapter 11 Case.

## I.    OVERVIEW OF THE DEBTOR'S BUSINESS

5.    The Debtor, a Delaware corporation founded in 1972, is an insurance holding company whose stock had, until October 21, 2011, been publicly-traded on the New York Stock Exchange.[3] Through its principal regulated subsidiary, PMI Mortgage Insurance Co. ("**MIC**"), and its affiliated companies (collectively, "**PMI**"), the Debtor provides residential mortgage

---

[2]    Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Motion.

[3]    The New York Stock Exchange halted trading in the Debtor's Common Stock on October 21, 2011.

insurance in the United States. Mortgage insurance provides loss protection to mortgage lenders and investors in the event of borrower defaults.

## A.    The Corporate Structure

6.    The Debtor is the ultimate parent entity of twenty-five (25) direct or indirect wholly-owned subsidiaries.[4]  Most recently, the Debtor has divided its business into three segments: U.S. Mortgage Insurance Operations, International Operations, and "Corporate/Other."

### i.    U.S. Mortgage Insurance Operations

7.    MIC, the Debtor's main operating entity, is the 100% owner of PMI Insurance Co. ("**PIC**") and PMI Mortgage Assurance Co. ("**PMAC**"), as well as other direct and indirect subsidiaries. MIC, PIC and PMAC are insurance companies regulated by the State of Arizona and licensed throughout the United States, Puerto Rico, Guam and the Virgin Islands. Prior to the events described below, MIC and its affiliates offered a broad range of mortgage insurance products to mortgage lenders and investors throughout the United States.

8.    MIC is also a 50% owner of interests in CMG Mortgage Insurance Company and CMG Mortgage Assurance Company, as well as its subsidiary CMG Reinsurance Company (collectively, "**CMG**"), each of which is an insurance company regulated by the State of Wisconsin. CMG provides mortgage insurance exclusively to credit unions.

9.    The Debtor is the 100% owner of PMI Reinsurance Co., PMI Mortgage Guaranty Co., and Residential Insurance Co., the Debtor's principal reinsurance subsidiaries (collectively, the "**Principal Regulated Reinsurance Subsidiaries**"), which are regulated by the State of Arizona. Certain states limit the amount of risk a mortgage insurer may retain on a single loan to

---

[4]    A chart depicting the corporate structure of the Debtor and its affiliates is attached hereto as Exhibit A.

25% of the indebtedness to the insured, and, as a result, the portion of such insurance in excess of 25% ("**deep coverage**") must be reinsured. To minimize reliance on third party reinsurance companies and to permit PMI to retain the premiums (and related risk) on deep coverage business, the Debtor formed the Principal Regulated Reinsurance Subsidiaries to provide reinsurance of such deep coverage to MIC.

ii.    *International Operations*

10.    PMI Mortgage Insurance Holdings Canada Inc. and PMI Mortgage Insurance Company Canada (together, "**PMI Canada**"), as well as PMI Europe Holdings Limited and its direct subsidiaries (collectively, "**PMI Europe**"), form the international operations segment of the Debtor's enterprise. PMI Canada offered residential mortgage insurance products in Canada in 2007 and 2008, whereas PMI Europe offered mortgage insurance and mortgage credit enhancement products, tailored primarily to the European mortgage markets, through 2008. Currently, neither PMI Canada nor PMI Europe is writing new business.

iii.    *"Corporate/Other" Segment*

11.    The Debtor's "Corporate/Other" segment consists of, among other things, contract underwriting operations (which were discontinued in April 2009), former investments in FGIC Corporation, which the Debtor sold in the third quarter of 2010, RAM Re, which was sold in the fourth quarter of 2009, and equity in earnings or losses from investments in certain limited partnerships.

**B.    Regulatory Issues**

12.    The Debtor and its insurance company subsidiaries are subject to comprehensive, detailed regulation by state insurance departments whose primary goal is to safeguard insurers' solvency for the protection of policyholders. Though their scope varies, state insurance laws

4

generally grant broad powers to supervisory agencies and officials to examine and investigate insurance companies and to enforce rules or exercise discretion touching almost every aspect of the Company's business.

13.     With respect to insurance holding companies, all states have enacted legislation that requires each insurance company in a holding company system to register with the insurance regulatory authority of its state of domicile and to furnish to such regulatory authority financial and other information concerning the operations of, and the interrelationships and transactions among, companies within the holding company system that may materially affect the operations, management or financial condition of the insurers within the system.  The states also regulate transactions between insurance companies and their parents and non-insurer affiliates.

14.     The Debtor is treated as an insurance holding company under the laws of the State of Arizona.  The Arizona insurance laws govern, among other things, certain transactions in the Debtor's common stock and certain transactions between or among the Debtor and its domestic and international subsidiaries.  In addition, all material transactions involving MIC, PIC, and/or PMAC, and any of their affiliates, such as PMI Europe and PMI Canada, as well as the Principal Regulated Reinsurance Subsidiaries, are subject to prior approval of the Arizona Department of Insurance (the "**ADI**"), and may be disapproved if they are found to be not "fair and reasonable."

15.     On August 4, 2011, the Debtor filed its Quarterly Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (the "**Q2 2011 10-Q**").  In the Q2 2011 10-Q, MIC reported a policyholders' position of $258 million and a minimum policyholders' position of $578 million, resulting in a policyholders' position deficit of $320 million.  PIC's policyholders' position was also reported as deficient in the Q2 2011 10-Q by approximately $45 million.

5

### C. Shared Services

16.     On January 1, 1996, the Debtor and MIC entered into a Cost Allocation Agreement, which was subsequently amended on September 1, 2003 and April 13, 2006 (as amended, the "**CAA**"). The CAA governs a shared services arrangement between the Debtor and MIC, pursuant to which MIC provides the Debtor with certain accounting, auditing, legal, investment, personnel and other administrative services, as well as the use of certain of MIC's facilities, on a cost allocation basis. In particular, the Debtor is required to reimburse MIC for the Debtor's estimated actual portion of the services and facilities on a quarterly basis.

17.     Under the CAA, the Debtor also is required to reimburse MIC for any payments made by MIC on the Debtor's behalf to third parties, including, but not limited to, payments in respect of (a) goods and/or services provided to, or on behalf of, the Debtor under contracts with third parties, and (b) taxes, licenses, fees, assessments and/or costs imposed by government or quasi-government agencies, or associations or organizations of which the Debtor is a member.

18.     The Debtor hopes to negotiate the terms of a transition services agreement with MIC that would encompass the shared services arrangement governed by the CAA, although there can be no assurance that it will be able to reach such an agreement with MIC. Until a transition services agreement is finalized or a determination has been made to reject the CAA, the Debtor intends to continue to operate under the CAA, consistent with its prepetition practice (although, at this point, the Debtor is not requesting authority to assume the CAA), and intends to pay the fees to MIC for the shared services (the "**Shared Services**") on a go-forward basis, in accordance with the Debtor's prepetition practices.

19.     In addition to the CAA, the Debtor is a party to a Tax Sharing Agreement with its subsidiaries (the "**TSA**"), which benefits the Debtor materially by reducing the Debtor's

6

obligations and liquidity requirements. In particular, the TSA allocates current tax expense (benefit) and tax payments (refunds) between the Debtor and its insurance subsidiaries.

### D. Preservation of Net Operating Losses and Tax Attributes

20. As of June 30, 2011, the Debtor had access to, for U.S. federal income tax purposes, net operating losses ("**NOLs**") of approximately $1.127 billion and income tax credits (the "**Tax Credits**," and together with the NOLs and other tax attributes, the "**Tax Attributes**") of approximately $195 million. The Debtor projects significant additional NOLs for its 2011 taxable year.

21. Internal Revenue Code ("**IRC**") sections 39(a), 59(e), 172(b) and 904(c) permit a corporation to carry forward tax attributes to offset future income, thereby reducing tax liability in future tax periods. A reduction in tax liability generally has a positive effect on a corporation's cash position. Thus, the Tax Attributes are valuable assets of the Debtor's estate, and their availability could be integral to the Debtor's successful reorganization. The Debtor's ability to use the Tax Attributes, however, could be severely limited under IRC sections 382 and 383 as a result of transfers of claims and Debtor stock prior to the consummation of a chapter 11 plan. In order to preserve the Debtor's ability to use the Tax Attributes, the Debtor has filed a motion, contemporaneously herewith, to establish procedures to protect and preserve the Debtor's access to the Tax Attributes.

## II. SUMMARY OF ASSETS AND LIABILITIES

### A. Estimated Assets

22. The Debtor's principal assets consist of approximately $165 million in cash, the value of the Debtor's equity interests in its subsidiaries, including MIC and the Debtor's Principal Regulated Reinsurance Subsidiaries, principal and interest payments related to the

Surplus Notes (as defined and described below),[5] and the potentially valuable Tax Attributes described above. The possibility of pursuing discussions with the Director of the ADI, the Debtor's creditors and potential new investors with respect to the possible formation of a new company, as was contemplated pre-petition as more fully described below, has the potential to add additional value to the Debtor's estate.

**B      Prepetition Indebtedness**

23.      Pursuant to indentures entered into between 2003 and 2010, the Debtor is obligated on various issues of outstanding bonds (the "**Notes**") in the aggregate approximate amount of $736 million.[6] Each outstanding series and the approximate principal amounts owing are as follows:

| Indenture | Principal Outstanding Amount as of December 31, 2010 |
|---|---|
| 6.000% Senior Notes, due September 15, 2016 | $250,000,000 |
| 6.625% Senior Notes, due September 15, 2036 | $150,000,000 |
| 8.309% Junior Subordinated Debentures, due February 1, 2027 | $51,593,000 |
| 4.50% Convertible Senior Notes, due April 15, 2020 | $285,000,000 |

*i.      6.000% and 6.625% Senior Notes*

24.      In September 2006, the Debtor issued $250 million in principal amount of 6.000% Senior Notes, due September 15, 2016 (the "**6.000% Senior Notes**") and $150 million in principal amount of 6.625% Senior Notes, due September 15, 2036 (the "**6.625% Senior**

---

[5]      The Debtor believes that the Surplus Notes will be treated as impaired for accounting purposes as of September 30, 2011.

[6]      The aggregate approximate amount of the Notes was determined based on representations contained in the Q2 2011 10-Q.

Notes"). The 6.000% Senior Notes and the 6.625% Senior Notes bear interest at the rates of 6.000% and 6.625% per annum, respectively, payable semi-annually in arrears on March 15 and September 15 of each year.

### ii.    8.309% Junior Subordinated Debentures

25.    The Debtor entered into a Junior Subordinated Indenture dated February 4, 1997, pursuant to which the Debtor issued unsecured Junior Subordinated Debentures. The Junior Subordinated Debentures bear interest at the rate of 8.309% per annum, payable semi-annually in arrears on February 1 and August 1, and mature on February 1, 2027. The Junior Subordinated Debentures are subordinated to all senior indebtedness of the Debtor.

### iii.    4.50% Convertible Senior Notes

26.    In the second quarter of 2010, the Debtor completed a concurrent public offering of equity and debt, including the sale of $285 million aggregate principal amount of 4.50% Convertible Senior Notes due April 15, 2020 (the "**4.50% Convertible Senior Notes**") and received aggregate net proceeds of approximately $732 million.[7] Of these aggregate net proceeds, the Debtor contributed approximately $610 million to MIC in the form of capital, comprised of cash proceeds and two surplus notes with combined aggregate face amounts of $285 million (the "**Surplus Notes**").

27.    The terms of the Surplus Notes provide for interest, principal and redemption payments that are generally concurrent with and equivalent to the payment of interest, principal and redemptions with respect to the 4.50% Convertible Senior Notes or cash settlement of conversions of the 4.50% Convertible Senior Notes once such conversions exceed a specified level. All interest payments and principal repayments on the Surplus Notes and early redemption

---

[7]    The 4.50% Convertible Senior Notes bear interest at the rate of 4.50% per annum, payable semi-annually in arrears on April 15 and October 15.

of the Surplus Notes are subject to the prior approval of the ADI, which issued a letter, prior to the filing, pre-approving regularly scheduled interest payments to the Debtor on the Surplus Notes. However, the Arizona Supervision Order (defined below) issued on August 19, 2011, prohibited further interest payments on the Surplus Notes and MIC has ceased payments to the Debtor on the Surplus Notes.

## III. EVENTS LEADING TO THE DEBTOR'S CHAPTER 11 FILING

### A. Current Economic Conditions

28. Mortgage insurance coverage, such as the coverage issued by PMI, has several attributes that make mortgage insurance companies like PMI more susceptible to the cyclical nature of the economy in general, and the housing and labor markets in particular, than many other types of insurance companies. Mortgage insurance is generally renewable at the option of the insured at the premium rate fixed when the insurance on the loan was initially issued. As a result, losses from increased claims from policies originated in a particular year cannot be offset by renewal premium increases on policies in force. Because PMI recognizes its losses when it receives notices of default, the period over which PMI generates losses can be prolonged. In addition, PMI may not cancel the insurance coverage it issues except in the event of nonpayment of premiums or certain violations of PMI's master policies. Therefore, the average life of a PMI mortgage insurance policy generally has ranged from approximately four to ten years and may span a significant portion of an economic or real estate cycle. As a result, the loss ratios, which are the ratios of an insurer's incurred losses to premiums earned, of PMI and the mortgage insurance industry are particularly affected by the cyclical nature of the U.S. economy and housing and labor markets.

01: 11598359.8 070559.1001

29.     Continued high unemployment in the United States and the slow economic recovery (as compared to previous recoveries) in U.S. residential mortgage and housing markets are reflected in PMI's recent elevated loss ratios.

30.     Historically, the Debtor's primary source of revenue has been dividends paid by its subsidiaries.  However, the Debtor has not received a dividend payment from any of its subsidiaries since 2007.  Moreover, as detailed below, the ADI has the right to prohibit the Debtor's regulated insurance subsidiaries from issuing dividends and has, in fact, so prohibited such subsidiaries.

B.     **Exploration of an Extraordinary Transaction**

31.     Since mid-2011, the Debtor has been exploring a transaction (the "**Extraordinary Transaction**") that would have involved utilizing PMAC as the vehicle to write new mortgage insurance nationwide.  As noted above, PMAC is a wholly-owned subsidiary of MIC and is licensed to write mortgage insurance in all fifty states.  The Debtor contemplated that, as part of the Extraordinary Transaction, (i) the Debtor would contribute cash or its Principal Regulated Reinsurance Companies to MIC in exchange for equity of PMAC, (ii) MIC would transfer its operating platform (including its information technology systems) to PMAC in exchange for equity of PMAC, and (iii) a new investor or investors would invest significant new capital in exchange for an equity interest in PMAC.  Management of the Debtor believed that the Extraordinary Transaction had the potential of significantly enhancing the value of the Debtor for the benefit of its creditors.  In addition, management of the Debtor believed that the Extraordinary Transaction offered the prospect of generating significant additional value for MIC and its policyholders through MIC's retained equity interest in PMAC and, accordingly, that the Extraordinary Transaction would be viewed favorably by the Arizona Department of

11

Insurance, as the principal regulator of MIC, and Fannie Mae and Freddie Mac (collectively, the "**GSEs**"), who were MIC's largest policyholders.

32.     In connection with the Extraordinary Transaction, the Debtor's management and financial advisors met with potential investors, a number of whom signed confidentiality agreements and engaged in due diligence.     In addition, the Debtor and MIC met with representatives of the GSEs and of the Federal Housing Finance Agency, as conservator of the GSEs, to seek the designation of PMAC as an eligible mortgage insurer by each of the GSEs. Throughout this process, the Debtor and MIC pursued discussions with the Director of the ADI (the "**ADI Director**") regarding the benefits of the Extraordinary Transaction to policyholders of MIC that could accrue from MIC's interest in PMAC.   The Debtor believes an Extraordinary Transaction that had the prospect of generating significant additional value for the Debtor and its creditors continued to be a realistic possibility until the ADI Director assumed exclusive power of management and control over MIC pursuant to the Interim Possessory Order, as described below.

### C.     Regulatory Control of MIC

33.     On August 19, 2011, the ADI Director, the Debtor's principal regulator, issued an order placing MIC and PIC (the "**Principal Regulated Insurance Subsidiaries**") under supervision (the "**Arizona Supervision Order**") pursuant to §20-169 of the Arizona Revised Statutes. The Arizona Supervision Order appointed Truitte D. Todd, of Tharp and Associates, as supervisor of MIC and PIC, and required MIC and PIC to cease writing new mortgage commitments in all states as of the date thereof, but permitted the issuance of new mortgage insurance policies under pending commitments through the close of business on September 16, 2011.

34.　In addition to prohibiting the Principal Regulated Insurance Subsidiaries from writing new business, the Arizona Supervision Order further prohibited the Principal Regulated Insurance Subsidiaries from making payments to the Debtor on the Surplus Notes and from entering into affiliate transactions (including an Extraordinary Transaction, as contemplated above) without the prior approval of the ADI Director.

35.　The Arizona Supervision Order further provided that if, within sixty days, the Principal Regulated Insurance Subsidiaries failed to abate the ADI Director's determination that supervision of such entities was required under §20-1550 of the Arizona Revised Statutes and §R20-6-308 of the Arizona Administrative Code, the ADI Director could commence a conservatorship proceeding.

36.　Upon entry of the Arizona Supervision Order, MIC worked diligently with the Supervisor and the ADI Director to continue to investigate restructuring alternatives, including implementing an Extraordinary Transaction as described above, and to abate the ADI Director's finding.

37.　On October 20, 2011, the ADI Director assumed exclusive power of management and control over the Debtor's Principal Regulated Insurance Subsidiaries pursuant to an interim Order Directing Full and Exclusive Control of Insurer entered in the Superior Court of the State of Arizona in and for the County of Maricopa (the "**Interim Possessory Order**") issued on an *ex parte* basis pursuant to §20-172 of the Arizona Revised Statutes. The Debtor filed a motion to vacate the Interim Possessory Order on October 28, 2010, which was denied by the Superior Court of the State of Arizona on November 22, 2011. The hearing on the ADI Director's Application for Appointment of Receiver and Order to Show Cause has been set for January 10, 2012.

38. Also, on October 20, 2011, the ADI Director entered an order (the "**Reinsurance Supervisory Order**") placing the Principal Regulated Reinsurance Subsidiaries under supervision pursuant to §20-169 of the Arizona Revised Statutes.

39. The ADI Director also filed a Verified Complaint for Appointment of a Receiver and Injunction seeking, among other things, the appointment of a receiver in respect of the Debtor's Principal Regulated Insurance Subsidiaries.

40. Since October 21, 2011, when the Debtor was first informed of the ADI Director's action, the ADI Director has provided only limited cooperation with the Debtor in regards to obtaining access to the Debtor's books and records. In particular, as of October 21, 2001, the Debtor's employees were locked out of their offices, unable to access the Debtor's financial information and documents, and unable to access their electronic mail. As of the date hereof, the Debtor has been provided with certain corporate records, but does not yet have access to its complete financial, accounting or operational information.

### D. Defaults under the Notes

41. The Supplemental Indenture for the Debtor's 4.50% Convertible Senior Notes provides that, among other things, the following are Events of Default under the Supplemental Indenture:

> the entry by a court having jurisdiction in the premises of (A) a decree or order for relief in respect of a Significant Subsidiary of the Company in an involuntary case or proceeding under any applicable Federal or State bankruptcy, insolvency, reorganization or other similar law or (B) a decree or order adjudging a Significant Subsidiary of the Company a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of such a Significant Subsidiary under any applicable Federal or State law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of such a Significant Subsidiary or of any substantial part of its property, or ordering the winding up or liquidation of such a Significant Subsidiary's affairs, and the continuance of any such decree or

01: 11598359.8 070559.1001

order for relief or any such other decree or order unstayed and in effect for a period of 60 consecutive days.

The commencement by a Significant Subsidiary of the Company of a voluntary case or proceeding under any applicable Federal or State bankruptcy, insolvency, reorganization or other similar law or of any other case or proceeding to be adjudicated a bankrupt or insolvent, or the consent by it to the entry of a decree or order for relief in respect of such a Significant Subsidiary in an involuntary case or proceeding under any applicable Federal or State bankruptcy, insolvency, reorganization or other similar law or to the commencement of any bankruptcy or insolvency case or proceeding against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under any applicable Federal or State law, or the consent by it to the filing of such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator or other similar official of such a Significant Subsidiary or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due, or the taking of corporate action by such a Significant Subsidiary in furtherance of any such action.

See Supplemental Indenture, Articles 6(e) and (f). MIC is a Significant Subsidiary for purposes of the Supplemental Indenture. Upon either such Event of Default, the outstanding principal of the 4.50% Convertible Senior Notes will automatically become immediately due and payable.

42.     In addition, in the event of a Fundamental Change (as defined in the Supplemental Indenture), each holder of the 4.50% Convertible Senior Notes will have the right, at such holder's option, to require the Debtor to repurchase for cash such holder's Notes at 100% of the principal amount thereof, plus accrued and unpaid interest, on a date specified by the Debtor that is not less than 20 calendar days nor more than 35 calendar days following the date of the Debtor's notice of the Fundamental Change. The Debtor is required to provide such notice on or before the 20th calendar day after the occurrence of the Fundamental Change. Among other events, a Fundamental Change will occur if the Common Stock ceases to be listed or quoted on The New York Stock Exchange.

43.     As discussed above, the New York Stock Exchange halted trading in the Debtor's Common Stock on October 21, 2011, and the Debtor expects that trading in the Debtor's Common Stock may be suspended in the near term.

44.     The Debtor does not have the financial resources to repurchase the outstanding principal amount of the 4.50% Convertible Senior Notes if it were required to do so. The failure to repurchase the 4.50% Convertible Senior Notes as required would constitute an Event of Default with respect to the 4.50% Convertible Senior Notes and permit acceleration of the outstanding principal amount of the 4.50% Convertible Senior Notes.

45.     Additionally, pursuant to the Indenture for the Debtor's 6.000% Senior Notes and 6.625% Senior Notes, if the principal amount of the 4.50% Convertible Senior Notes was accelerated and such indebtedness was not discharged or such acceleration was not rescinded or annulled within a period of 30 days after notice by the Trustee or the holders of the 4.50% Convertible Senior Notes, an Event of Default would exist with respect to the 6.000% Senior Notes and 6.625% Senior Notes, as applicable, and the holders of each such series of Notes could cause the principal amount of the Notes of such series to become immediately due and payable.

46.     The Debtor does not have the financial resources to pay the outstanding principal amount of the 4.50% Convertible Senior Notes, the 6.000% Senior Notes and the 6.625% Senior Notes if such amounts were to become due and payable.

47.     In sum, the ADI Director's action in seeking a receivership of MIC, among other things, has led the Debtor to seek bankruptcy protection in order to maximize value for its estate and creditors.

01: 11598359.8                                                                 070559.1001

## IV. FIRST DAY MOTIONS

48. In furtherance of the objective of successfully administering this Chapter 11 Case and maximizing value for all creditors, the Debtor has sought approval of the First Day Motions and related orders (the "**Proposed Orders**"), and respectfully requests that the Court consider entering orders granting such First Day Motions.

49. I have reviewed each of the First Day Motions and Proposed Orders (including the exhibits thereto) listed on <u>Exhibit B</u> and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.

50. Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enable the Debtor to make the transition to, and operate in, chapter 11 with a minimum of interruption or disruption to its business or loss of productivity or value and (b) constitutes a critical element in achieving the maximization of the Debtor's value

51. Accordingly, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of this case, I respectfully request that each of the First Day Motions be granted in its entirety.

## V. CONCLUSION

52. The Debtor's ultimate goal in this Chapter 11 Case is to maximize the value of the Debtor's estate for the benefit of its creditors through a chapter 11 plan process. Approval of the First Day Motions will help the Debtor realize that goal by allowing it to focus its energies on a successful Chapter 11 Case which will maximize creditor recoveries. I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for completing a successful chapter 11 process will be substantially enhanced.

01: 11598359.8 070559.1001

53.     I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just.

070559.1001

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of ___Novermber___, 2011.

Respectfully Submitted,

THE PMI GROUP, INC.

_____

L. Stephen Smith
Chairman, Chief Executive Officer, President
and Chief Operating Officer

# EXHIBIT A

**Organizational Chart for Debtor and its Non-Debtor Subsidiary Companies**

# THE PMI GROUP, INC.
## Wholly- and Partially-Owned Subsidiaries and Affiliates

**The PMI Group, Inc.**
A Delaware Corp.

- **PMI Capital I**
  A Delaware Trust

- **Homeowner Reward Co.**
  An Arizona Corp.

- **PMI Capital Corporation**
  A Delaware Corp.
  - **PMI Mortgage Insurance Holdings Canada Inc.**
    (A Canada Corp.)
  - **PMI Mortgage Insurance Company Canada**
    (A Canada Corp.)
  - **PMI Europe Holdings Limited**
    A Dublin Corp.
    - **PMI Mortgage Insurance Company Limited**
      An Ireland Corp.
    - **PMI CDS II Limited**
      An Ireland Corp.
    - **PMI CDS (Cayman) III Limited**
      A Cayman Islands, BWI Corp.
    - **PMI CDS (Cayman) V Limited**
      A Cayman Islands, BWI Corp.
    - **PMI CDS (Cayman) VII Limited**
      A Cayman Islands, BWI Corp.
  - **PMI Insurance Co.**
    An Arizona Corp.

- **PMI Management Services, SA de CV**
  A Mexico Corp.
  PMICC owns 98%; PMI owns 2%
  - **PMI Mortgage Assurance Co.**
    An Arizona Corp.

- **PMI Mortgage Insurance Co.**
  An Arizona Corp.
  - **PMI Securities Co.**
    A Delaware Corp.
    - **PMIPAC**
      An Arizona Non-Profit Political Organization
    - **PMI Mortgage Insurance Co. Federal PAC**
      A Federal Non-Profit Political Organization
  - **PMI Mortgage Services Co.**
    A California Corp.
    - **The PMI Foundation**
      A California Non-Profit Corp.
  - **PMI Plaza LLC**
    A Delaware Limited Liability Company
  - **CMG Mortgage Insurance Company**
    A Wisconsin Corp.
    (50% owned by PMI)
    - **CMG Mortgage Assurance Company**
      A Wisconsin Corp.
      (50% owned by PMI)
    - **CMG Mortgage Reinsurance Company**
      A Wisconsin Corp.

- **PMI Specialty Assurance Co.**
  An Arizona Corp.

- **Residential Insurance Co.**
  An Arizona Corp.

- **PMI Mortgage Guaranty Co.**
  An Arizona Corp.

- **PMI Reinsurance Co.**
  An Arizona Corp.

# EXHIBIT B

## List of First Day Motions

1. MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO EMPLOY AND RETAIN KURTZMAN CARSON CONSULTANTS LLC AS NOTICE, CLAIMS, AND SOLICITATION AGENT *NUNC PRO TUNC* TO THE PETITION DATE

2. DEBTOR'S MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 345, 363, 1107 AND 1108 (I) AUTHORIZING CONTINUED USE OF EXISTING BANK ACCOUNTS AND CHECKS; (II) WAIVING THE REQUIREMENTS OF 11 U.S.C. § 345 ON AN INTERIM BASIS; and (III) GRANTING ADMINISTRATIVE EXPENSE STATUS TO "SHARED SERVICES" ARISING POST-PETITION

3. MOTION OF THE DEBTOR FOR THE ENTRY OF AN ORDER (A) AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO REMIT AND PAY CERTAIN TAXES AND (B) AUTHORIZING AND DIRECTING BANKS AND OTHER FINANCIAL INSTITUTIONS TO HONOR RELATED CHECKS AND ELECTRONIC PAYMENT REQUEST

4. MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO (A) PAY EMPLOYEE OBLIGATIONS, AND (B) CONTINUE EMPLOYEE BENEFITS PLANS AND PROGRAMS POSTPETITION; (II) CONFIRMING THAT DEBTOR IS ABLE TO PAY WITHHOLDING AND PAYROLL-RELATED TAXES; AND (III) DIRECTING ALL BANKS TO HONOR PREPETITION CHECKS FOR PAYMENT OF EMPLOYEE OBLIGATIONS

5. THE DEBTOR'S MOTION FOR EMERGENCY INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 105, 362 AND 541 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3001 ESTABLISHING PROCEDURES FOR (I) TRANSFERS OF CLAIMS, (II) TRANSFERS OF EQUITY SECURITIES, (III) TAKING OR IMPLEMENTING CERTAIN OTHER ACTIONS AFFECTING THE INTEREST OF THE DEBTOR IN THE TAX ATTRIBUTES, AND (IV) SCHEDULING A FINAL HEARING

01: 11598359.8 070559.1001