IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**The PMI Group, Inc.,**<br><br>Debtor. | Chapter 11<br><br>Case No. 11-13730 (BLS)<br><br><br>Related to Docket Nos. 1019<br>& 1047 |

Pauline K. Morgan, Esq.
Young Conaway Stargatt
  & Taylor, LLP
1000 North King Street
Wilmington, DE 19801

  and

Andrew G. Dietderich, Esq.
Sullivan & Cromwell, LLP
125 Broad Street
New York, NY 10024

  *Counsel to the Debtor*

John G. Miscisin
548 Market Street
#24787
San Francisco, CA 94104

  *Pro se claimant*

# OPINION[1]

Before the Court are the claim of John Miscisin against The PMI Group, Inc. (the "Debtor") [Claim No. 659][2]; the Debtor's Fourth Omnibus (Substantive) Objection to Claims Pursuant to Section 502(b) of the Bankruptcy Code, Bankruptcy Rules 3003 and 3007, and Local Rule 3007-1 (the "Objection to Claims") [Docket No. 1019]; and Mr. Miscisin's response (the "Response") [Docket No. 1047]. The Debtor objects to Mr. Miscisin's claim for $224,000 he seeks under the Debtor's salary continuation plan (the "Salary Continuation Plan"). The Debtor argues

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedure. *See* Fed. R. Bankr. P. 7052, 9014(c).

[2] The claims agent in this case is Kurtzman Carson Consultants, LLC.

that there was no change in control as defined in the Salary Continuation Plan ("Change in Control"), which is one of the requirements for an award of benefits, and that the Debtor should be accorded deference in its decision to deny benefits to Mr. Miscisin. For the reasons that follow, the Court will sustain the Debtor's objection to Mr. Miscisin's claim, and disallow that claim.[3]

## I. BACKGROUND

### A. General Background[4]

Through its subsidiaries, the Debtor provided residential mortgage insurance throughout the United States, offering loss protection to mortgage lenders and investors in the event of borrower defaults. At the time of its Chapter 11 filing, the Debtor was the ultimate parent entity of 25 direct or indirect wholly-owned subsidiaries, with its principal regulated subsidiary being PMI Mortgage Insurance Co. ("MIC").

As insurers, the Debtor and its subsidiaries are subject to comprehensive, detailed state laws governing the insurance industry. At issue in this case are the consequences arising out of the implementation of insurer solvency protection provisions under the laws of the State of Arizona.

### B. Regulatory Takeover of MIC

On August 19, 2011, the Arizona Department of Insurance (the "ADI") issued an order placing MIC and one of its subsidiaries, PMI Insurance Co. ("PIC"), under supervision, pursuant to § 20-169 of the Arizona Revised Statutes. Section 20-169 provides that if an insurance company appears to be insolvent in the opinion of the director of the ADI, the ADI Director must notify the insurance company of his determination and provide a written list of the ADI Director's requirements to abate the determination. Ariz. Rev. Stat. § 20-169. Thereafter, the insurance company has 60 days to satisfy such requirements, otherwise the ADI Director must take charge as conservator of the insur-

---

[3] The Debtor does not object to the $873 that Mr. Miscisin seeks as a 401(k) matching obligation, and that claim is therefore allowed as an unsecured priority claim.
[4] Because the parties are familiar with the corporate structure of the Debtor and its subsidiaries, and the history of the case, the Court provides only this summary background.

~ 2 ~

ance company. *Id.* Thus, after the August 19, 2011 Order, MIC and PIC had 60 days to become solvent or a conservatorship proceeding would be commenced.

MIC and PIC were unable to abate the ADI Director's determination, and a conservatorship proceeding was commenced in the Superior Court of the State of Arizona, County of Maricopa. On October 20, 2011, the Arizona Superior Court issued an Interim Order Directing Full and Exclusive Control of the Insurer pursuant to § 20-172 of the Arizona Revised Statutes, which provides that "upon submission of a verified petition stating that an insurer is in such an unsafe or unsound condition that it is or will become unable to meet the anticipated demands of its policyholders and that the condition cannot be corrected by the procedures of §§ 20-169, 20-170 or 20-171," the ADI Director may "obtain an order from the superior court allowing the director to immediately take possession and control of the insurer pending a hearing on the appointment of a receiver." Ariz. Rev. Stat. § 20-172(A). The Arizona Superior Court subsequently entered an order on March 14, 2012, appointing the ADI Director as receiver of MIC.

### C. The Debtor's Bankruptcy

While the ADI was pursuing the receivership of MIC in Arizona Superior Court, the Debtor filed a voluntary Chapter 11 petition with this Court on November 23, 2011. As the case progressed, the Debtor filed a proposed Chapter 11 Plan of Reorganization [Docket No. 842] on April 30, 2013, and a First Amended Chapter 11 Plan of Reorganization [Docket No. 882] on June 3, 2013. The Court entered an Order Confirming First Amended Plan of The PMI Group, Inc. [Docket No. 1015] on July 25, 2013. Regarding the instant matter, the Debtor filed its Objection to Claims, objecting to Mr. Miscisin's claim for benefits under the Salary Continuation Plan, and Mr. Miscisin filed his Response in opposition.

### D. The Salary Continuation Plan

The Salary Continuation Plan provides for severance benefits to eligible employees in the event of an involuntary termination without cause, or a resignation by the employee for good cause, within a certain period following a Change in Control of the Debtor. Mr. Miscisin as-

serts that he is due benefits based on his resignation in September 2012, following the regulatory takeover of MIC by the ADI. The Debtor concedes that Mr. Miscisin was a covered employee who would be entitled to benefits if the Salary Continuation Plan requirements were met, that he resigned with good cause, and that the resignation took place in the relevant period following the takeover by the ADI. The dispute focuses on whether the takeover by the ADI constituted a Change in Control of the Debtor as defined in the Salary Continuation Plan. Specifically, Mr. Miscisin argues that the takeover by the ADI constituted a Change in Control as defined in Section 2.5(c) of the Salary Continuation Plan, and the Debtor disagrees.[5]

## II.    THE PARTIES' POSITIONS

### A. Mr. Miscisin's Position

Mr. Miscisin contends that the ADI takeover of MIC constituted a Change in Control of the Debtor under Section 2.5(c). First, Mr. Miscisin argues that MIC was the Debtor's most valuable asset and should be considered "substantially all of the assets of the Company." Salary Continuation Plan § 2.5(c). He alleges that the Debtor's other assets were only possible through debt that was borrowed based on MIC's revenue potential. Second, Mr. Miscisin argues that the Salary Continuation Plan was intended to protect and incentivize employees to stay at the company after any change in management, even a compulsory takeover. Third, he points to the fact that the definition of Change in Control under Section 2.5(c) includes a reorganization, and that a reorganization could be voluntary or involuntary. Since the Salary Continuation Plan does not specify that only voluntary reorganizations count, Mr. Miscisin proposes that it covers both and therefore the Salary Continuation Plan encompasses involuntary events.

### B. The Debtor's Position

The Debtor contends in response that the ADI takeover of MIC did not constitute a Change in Control of the Debtor under Section 2.5(c). First, the Debtor argues that the asset at issue is the Debtor's

---

[5] It is undisputed that the takeover does not qualify as a Change in Control under Sections 2.5(a), (b), or (d).

stock in MIC, and the Debtor retained such stock during the period of the ADI takeover even though it was not able to enjoy all of the benefits of ownership that it typically enjoyed. While all or substantially all of MIC's assets were taken over by the ADI, the Debtor retained its asset—the stock in MIC. Second, the Debtor's intention was to protect employees in the event they were negatively affected following a change in management that the Debtor instituted, not to insure against events that were imposed on the Debtor by an outside party. Third, the Debtor argues that Section 2.5(c) only covers voluntary events because Change in Control is defined as a "consummation *by the Company* of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company" (emphasis added). According to the Debtor, the ADI takeover was not a consummation "by the Company" of a sale or disposition of MIC or its assets because the takeover was initiated by the ADI in its role as regulator and not commenced by the Debtor. Finally, the Debtor argues that even if there are multiple valid interpretations, the Debtor is the plan administrator designated under the Salary Continuation Plan and its interpretation is therefore accorded deference under law.

## III.    JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Consideration of the Objection to Claims constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O).

## IV.    LEGAL ANALYSIS

### A. Standard of Review

Under Bankruptcy Rule 3001, a "proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). The initial burden is on the objector "to produce evidence sufficient to negate the *prima facie* validity of the filed claim." *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). "If the objector produces

sufficient evidence to negate one or more of the sworn facts in the proof
of claim, the burden reverts to the claimant to prove the validity of the
claim by a preponderance of the evidence." *Id.* at 174 (citing *In re
WHET, Inc.*, 33 B.R. 424, 437 (Bankr. D. Mass. 1983)).

In this case, the Debtor as the objector produced sufficient evi-
dence to negate the prima facie validity of Mr. Miscisin's claim. It is not
disputed that the Debtor is the administrator of the Salary Continuation
Plan, and the Debtor as administrator has determined that Mr. Miscisin
is not entitled to the benefits at issue. In order to prove the validity of
his claim, Mr. Miscisin needs to successfully challenge the Debtor's de-
nial of benefits.

Case law analyzing the denial of benefits under 29 U.S.C.
§ 1132(a)(1)(B), which creates a cause of action for ERISA plan partici-
pants to protect their rights under a plan, offers the appropriate frame-
work for the analysis here. In *Firestone*, the Supreme Court held that "a
denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed
under a *de novo* standard unless the benefit plan gives the administrator
or fiduciary discretionary authority to determine eligibility for benefits
or to construe the terms of the plan." *Firestone Tire & Rubber Co. v.
Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57, 103 L. Ed. 2d 80 (1989). In
this case, the Salary Continuation Plan at issue gives such discretionary
authority to the Debtor to determine eligibility for benefits. Section 12
of the Salary Continuation Plan states:

> The Company [Debtor][6] is the administrator of the Plan
> (within the meaning of Section 3(16)(A) of ERISA). The
> Plan will be administered and interpreted by the Admin-
> istrator (in his or her sole discretion). The Administrator
> is the "named fiduciary" of the Plan for purposes of
> ERISA and will be subject to the fiduciary standards of
> ERISA when acting in such a capacity. Any decision
> made or other action taken by the Administrator with re-
> spect to the Plan, and any interpretation by the Adminis-

---

[6] Section 2.1 of the Plan states: "'**Company**' means The PMI Group, Inc., a Delaware
corporation, and any successor by merger, acquisition, consolidation or otherwise that
succeeds to the obligations of the Company under the Plan" (emphasis in original).

> trator of any term or condition of the Plan, or any related
> document, will be conclusive and binding on all persons
> and be given the maximum possible deference allowed
> by law.

Despite a grant of discretionary authority, however, *Firestone* cautions that conflicts of interest must be taken into consideration when evaluating an administrator's decision: "Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187, Comment d (1959)).

Such a conflict exists where an employer administers the plan. "Often the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108, 128 S. Ct. 2343, 2346, 171 L. Ed. 2d 299 (2008) (citing *Firestone*, 489 U.S. at 115). "We here decide that this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case." *Glenn*, 554 U.S. at 108. "The employer's fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary. Thus, the employer has an 'interest . . . conflicting with that of the beneficiaries'. . . ." *Id.* at 112 (citing Restatement § 187, Comment d; *Firestone*, 489 U.S. at 115).

The Supreme Court stated that in dealing with this conflict of interest, "We do not believe that *Firestone*'s statement implies a change in the *standard* of review, say, from deferential to *de novo* review." *Glenn*, 554 U.S. at 115 (emphasis in original). Rather, "[w]e believe that *Firestone* means what the word 'factor' implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one." *Id.* at 117. The Supreme Court further explained:

> In such instances, any one factor will act as a tiebreaker
> when the other factors are closely balanced, the degree of
> closeness necessary depending upon the tiebreaking fac-
> tor's inherent or case-specific importance. The conflict of
> interest at issue here, for example, should prove more
> important (perhaps of great importance) where circum-
> stances suggest a higher likelihood that it affected the
> benefits decision, including, but not limited to, cases
> where an insurance company administrator has a history
> of biased claims administration. . . . It should prove less
> important (perhaps to the vanishing point) where the
> administrator has taken active steps to reduce potential
> bias and to promote accuracy, for example, by walling off
> claims administrators from those interested in firm fi-
> nances, or by imposing management checks that penalize
> inaccurate decisionmaking irrespective of whom the inac-
> curacy benefits. . . .

*Glenn*, 554 U.S. at 117 (internal citations omitted). Finally, the Supreme
Court noted "that our elucidation of *Firestone's* standard does not con-
sist of a detailed set of instructions." *Id.* at 119.

**B.    Analysis of Motion**

In this case, the Salary Continuation Plan grants discretion to the
Debtor to administer the plan. Under *Firestone's* holding that an ERISA
plan administrator with discretionary authority to interpret a plan is
entitled to deference in exercising that discretion, the Court concludes
the Debtor is entitled to a measure of deference in its denial of benefits
to Mr. Miscisin.

Under the subsequent holding in *Glenn*, the Debtor's dual role in
both determining whether an employee is eligible for benefits under
the Salary Continuation Plan while also being responsible for the pay-
ment of benefits is a conflict of interest. *Glenn* makes clear that the def-
erential standard of review remains appropriate even in the face of
such a conflict. The appropriate consideration of a conflict of interest is
to take it into account as a factor in determining whether there was an
abuse of discretion. Thus, the inquiry here is whether, taking into ac-

count the Debtor's conflict of interest, there was an abuse of discretion by the Debtor in its denial of benefits to Mr. Miscisin.

The Court concludes that the Debtor did not abuse its discretion in denying benefits to Mr. Miscisin. Under the Debtor's interpretation of the Salary Continuation Plan, the takeover by the ADI did not constitute a Change in Control of the Debtor, which is one of the requirements that must be met in order for Mr. Miscisin to be entitled to receive benefits. Under the relevant language in Section 2.5(c) of the Salary Continuation Plan, a Change in Control of the Debtor is "[c]onsummation by the Company of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company . . . ."[7] The arguments listed by the Debtor in supporting its interpretation of the Salary Continuation Plan are convincing. Given that the ADI took over the assets of MIC, not the stock in MIC which was the Debtor's primary asset; that the Debtor may not

---

[7] The full text of Section 2.5(c) of the Plan reads:

(c) Consummation by the Company of a reorganization, merger or consolidation or sale or other disposition of all or substantially all of the assets of the Company or the acquisition of assets of another entity (a "Business Combination"), in each case, unless, following such Business Combination, (i) all or substantially all of the individuals and entities who were the beneficial owners respectively, of the Outstanding Company Common Stock and Out-standing Company Voting Securities immediately prior to such Business Combination beneficially own, directly or indirectly, more than 60% of, respectively, the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Business Combination (including, without limitation, a corporation which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) in substantially the same proportions as their ownership, immediately prior to such Business Combination of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be, (ii) no Person (excluding any employee benefit plan (or related trust) of the Company or such corporation resulting from such Business Combination) beneficially owns, directly or indirectly, 20% or more of, respectively, the then outstanding shares of common stock of the corporation resulting from such Business Combination or the combined voting power of the then outstanding voting securities of such corporation except to the extent that such ownership existed prior to the Business Combination and (iii) at least a majority of the members of the board of directors of the corporation resulting from such Business Combination were members of the Incumbent Board at the time of the execution of the initial agreement, or of the action of the Board, providing for such Business Combination.

have been intending to protect employees in the face of events that were outside the Debtor's control; and that the language of Section 2.5(c) of the Salary Continuation Plan defines Change in Control as an action "by the Company" as opposed to a takeover imposed by a regulatory body, the Debtor's interpretation of the Salary Continuation Plan is not an abuse of discretion. Even factoring in the Debtor's conflict of interest in both determining eligibility and paying benefits, its arguments in support of its interpretation are robust enough that its interpretation will be upheld.

The Court is sympathetic to the fact that at first glance, the ADI takeover might look like a Change in Control of the Debtor, particularly for employees who experienced the ADI's presence at MIC. However, the Debtor and MIC are two legally distinct entities, and Change in Control is a term of art with a specific and detailed definition in the Salary Continuation Plan that is limited to actions taken by the Debtor. Since the Court has determined that the Debtor did not abuse its discretion in denying benefits, Mr. Miscisin has failed to carry his burden to prove the validity of his claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court will sustain the Debtor's objection to the $224,000 of benefits that Mr. Miscisin seeks under the Salary Continuation Plan. An appropriate Order follows.

**BY THE COURT:**

Dated: June 23, 2014
Wilmington, Delaware

Brendan Linehan Shannon
United States Bankruptcy Judge

~ 10 ~